UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Dawn K. Thorn            )
                         )
    Plaintiff,           )
                         )
v.                       )   No. 15 CV 50248
                         )   Magistrate Judge Iain D. Johnston
Nancy A. Berryhill, Acting )
Commissioner of Social Security,[1] )
                         )
    Defendant.           )

## MEMORANDUM OPINION AND ORDER

This is an action challenging the administrative law judge's ("ALJ") denial of social security disability benefits to plaintiff Dawn K. Thorn. *See* 42 U.S.C. §405(g). Plaintiff alleges that she cannot work because of fibromyalgia and edema.[2] The ALJ found that plaintiff's allegations were not credible and that she could work a full-time sedentary job if allowed to stand for one to two minutes after sitting for three hours. The Court finds that a remand is required to address several unresolved medical questions.

### BACKGROUND

Plaintiff filed her disability applications on April 24, 2009. A hearing was held on February 24, 2011. Plaintiff and a vocational expert testified, but no medical expert was called to testify. On March 30, 2011, the ALJ issued a 10-page ruling finding that plaintiff's fibromyalgia

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).
[2] *See Stedman's Medical Dictionary*, p. 725 (28th ed. 2006) (defining fibromyalgia: "A common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown."); *see id.* at p. 612 (28th ed. 2006) (defining edema: "**1.** An accumulation of an excessive amount of watery fluid in cells or intercellular tissues. **2.** At the gross level, used to describe the physical sign commonly likened to swelling or increased girth that often accompanies the accumulation of fluid in a body part, most often a limb.").

1

qualified as a severe impairment, but concluding that she could work a sedentary job if allowed to "stand for 1-2 minutes after sitting for an hour." R. 29.

After exhausting administrative remedies, on January 4, 2013, plaintiff filed a complaint in this Court challenging the ALJ's ruling on multiple grounds. Case No. 13-50007. Soon after plaintiff filed her opening brief, the parties filed an agreed motion to remand, which was granted by this Court. *See* Dkt. #14, 16. On October 22, 2013, the Appeals Council issued a three-page order remanding the case to the ALJ for a new hearing and decision. The Order specifically directed the ALJ to (among other things) "[o]btain additional evidence concerning the claimant's Fibromyalgia." R. 689. Before a new hearing was held, plaintiff underwent a new consultative examination performed by Dr. Charles J. O'Laughlin on February 27, 2014.

On July 1, 2014, the same ALJ held a second hearing. Plaintiff and a vocational expert testified. Also, plaintiff's friend testified. Again, no medical expert was called.

On October 29, 2014, the ALJ issued a second opinion, again finding plaintiff not disabled. Although this opinion was longer (18 pages), it follows the same general outline as the first with a few variations. The ALJ found that plaintiff had the following severe impairments: "obesity, fibromyalgia/polyarthritis/ lymphedema." R. 552. The ALJ concluded that plaintiff had the residual functional capacity ("RFC") to perform sedentary work subject to certain restrictions, one of which was that "after sitting for 3 hours she must be allowed to stand for 1-2 minutes."[3] R. 553. The ALJ's analysis is contained mostly in the following three paragraphs:

> I am not persuaded that the claimant's impairments have precluded her from all competitive work activity. Although the claimant has received treatment for the allegedly disabling impairment(s), that treatment has been essentially routine and/or conservative in nature. Given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor. Yet a review of the record in this case reveals no restrictions recommended by the treating doctor in her

---
[3] It is unclear why the sitting limitation changed from one hour in the first opinion to three in the second opinion.

2

> progress notes. There is also no objective evidence to support the claimant's allegations of "bad days".
>
> * * *
>
> While the claimant's lymphedema is recognized, it is noted that when she has edema it is mostly "trace" (Exhibit 18F). It is reported in the record that the claimant had edema issues particularly after getting tattoos but continues to keep getting them (Exhibit 18F, pp. 20 and 26). At the hearing, I observed the claimant to have multiple tattoos. Although the claimant allegedly uses a cane twice a week, she did not use the cane during exams at Exhibit 5F, 10F, 14F, and 15F and was noted to have a normal gait. There is no indication in the record that the claimant has to elevate her legs above heart level during the day.
>
> Additionally, the claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. At one point the claimant stated that she needed help washing her hair but at the initial hearing, I observed that her hair is very long. It is reasonable to assume that if this were a significant problem she would cut her hair in order to relieve herself of this burden. While the claimant complains of difficulty using her lower extremities and hands and testified that she occasionally uses a cane, she has also reported that she drives, fishes, performs daily activities, and uses a computer (Exhibits 5E, 8E, and 9F, p 2). More recently, at the consultative exam in February 2014, the claimant reported that she was able to prepare food, shop, take her child to school and therapy, do housework and drive regularly. The claimant testified that her fibromyalgia has gotten bad lately with flare-ups 2-3 times a week during which she cannot wipe herself after using the restroom and is tired. However, this is not documented in the record and the claimant is seen as functional in that she is not placed in nursing care and does not have a care provider. She also admitted to doing housework and other activities per Exhibit 14F.

R. 562. The ALJ then evaluated the medical opinions, giving "no weight" to the State agency physicians, to plaintiff's treating physician, and to plaintiff's friend. However, the ALJ gave "some weight" to Dr. O'Laughlin's opinion.

## DISCUSSION

On appeal plaintiff raises four main arguments: (1) the ALJ erred in rejecting her assertion that she must elevate her legs; (2) the ALJ erred in evaluating plaintiff's credibility; (3) the ALJ erred in rejecting third party testimony; and (4) the ALJ failed to apply the treating

3

physician rule. In Russian-nesting-doll fashion, several of these arguments include multiple sub-arguments, making the total number greater than four. Before considering them, two overarching points should be noted.

First, the ALJ did not adequately address plaintiff's fibromyalgia, which is the issue at the heart of this case. In remanding this case, the Appeals Council specifically ordered the ALJ to obtain additional evidence about this impairment. However, the ALJ did not do so insofar as this Court can determine. For example, the ALJ did not call a medical expert at the second hearing. It is true that an additional consultative examination was ordered, but as discussed below, Dr. O'Laughlin offered no additional insight into this issue.

The ALJ mentioned fibromyalgia often in the opinion, but the ALJ gave mixed signals about it, leaving this Court confused as to the ALJ's basic position. To summarize, at Step Two, the ALJ found that fibromyalgia was a severe impairment, but the ALJ never explained *why* she reached this conclusion. At Step Three (the listing analysis), the ALJ gave the following ambiguous statement:

> Pursuant to SSR 12-2p, fibromyalgia is not a listed impairment. Per Frederick Wolfe et al, "The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia", an individual must have pain in 11 of 18 tender point sites on digital palpation. The diagnosis of fibromyalgia is a conclusion which should be based upon the exclusion of other medically determinable impairments as a cause for pain complaints.

R. 553. This passage is confusing in several respects. It refers to two specific criteria (pain in 11 out of 18 tender points and exclusion of other causes), but then never clearly answers the obvious question of whether they have been met. Based on the context of the passage, the ALJ gives the impression that the criteria were not met, which would presumably mean that plaintiff did not have fibromyalgia. But if this were true, then it would contradict the ALJ's Step Two finding that fibromyalgia was a severe impairment and the ALJ's later RFC restriction that plaintiff must be

4

limited to simple and routine tasks due to "fibro fog." R. 554. In short, the ALJ's explanation waffles on the important predicate question of whether plaintiff had fibromyalgia.

This passage is inadequate in a second way. The ALJ referred to SSR 12-2p, which is the Social Security ruling specifically governing fibromyalgia. This Ruling identifies both general and specific criteria that ALJs must follow regarding fibromyalgia.[4] Unfortunately, the ALJ did not follow these procedures. On remand, the obvious starting point should be these procedures. If they had been followed, then the present confusion might have been avoided.

Second, the ALJ "played doctor" repeatedly throughout the opinion by making medical judgments not supported by any medical opinion in the record. This was improper. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (the ALJ should "rely on expert opinions instead of determining the significance of particular medical findings themselves"); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). As explained in SSR 12-2p, fibromyalgia is hard to diagnose and one factor is whether there are other underlying conditions that might be causing the symptoms. To rule out a myriad of other possible causes makes it even more

---

[4] In the "general criteria" section, SSR 12-2p states that a claimant can show that she has the medically determinable impairment of fibromyalgia by submitting evidence from a licensed physician who has reviewed the claimant's medical history and conducted a physical exam. The ruling states that the agency will "review the physician's treatment notes to see if they are consistent with the diagnosis of [fibromyalgia], determine whether the person's symptoms have improved, worsened, or remained stable over time, and establish the physician's assessment over time of the person's physical strength and functional abilities." In the "specific criteria" section, the ruling describes two tests or criteria to establish fibromyalgia. One test is the 1990 American College of Rheumatology Criteria, which has these three requirements: a history of widespread pain in all quadrants of the body that has persisted for at least 3 months; at least 11 positive tender points out of 18 on physical examination; and evidence that "other disorders that could cause the symptoms or signs were excluded" (also referred to as "ruling out" other explanations). The other test is the 2010 ACR Preliminary Diagnostic Criteria, and it too has three requirements. The first and the third are the same as the first test. The second requirement, rather than relying on a tender point analysis, states that the claimant must show "[r]epeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome." The ruling envisions that these tests will be used initially at Step Two in the assessment of whether a claimant's fibromyalgia constitutes a medically determinable impairment. Finally, the ruling contains a section addressing the situation in which there is "insufficient evidence" that a claimant's fibromyalgia qualifies as an impairment or whether it renders her disabled. This section states that the agency may take several actions to resolve the insufficiency, including recontacting the treating sources or requesting a consultative examination.

5

important for there to be an expert opinion, preferably from a rheumatologist, rather than having the ALJ make an arm-chair diagnosis. For this reason, on remand, the ALJ must call a medical expert. HALLEX I-2-5-34.A.1. With these points in mind, the Court will consider plaintiff's specific arguments.

I.       **Edema – Elevation of Legs**

Plaintiff argues that the ALJ failed to consider her edema, specifically her claim that she regularly needed to elevate her legs above her heart. As an initial point, it is not clear whether the edema had any connection to the fibromyalgia or whether it was a separate condition with its own unique considerations. In any event, plaintiff argues that, although the ALJ referred to plaintiff's edema in the narrative part of the opinion, the ALJ never specifically analyzed it later in the opinion—a recurring problem with ALJ decisions. *See Malinowski v. Colvin*, 15 CV 50233, 2017 U.S. Dist. LEXIS 7160, *3 n. 2 (N.D. Ill., Jan. 18, 2017). Plaintiff believes that the need to elevate her legs above heart-level would prevent her from working. The Court agrees that the ALJ failed to adequately address this issue.

The Government makes three unavailing counter-arguments. First, the Government questions plaintiff's testimony "that '[m]ost of the time] she is in a recliner with her feet propped above heart level." Dkt. #24 at 5. Specifically, the Government doubts whether plaintiff's feet would be above heart level in a recliner and then suggests (without offering any proof) that plaintiff's problems would be addressed better by using "an inversion table, not a recliner chair." *Id.* Aside from their speculative nature of these arguments, the larger problem is that they were never relied on by the ALJ. They are after-the-fact explanations and, as such, violate the *Chenery* doctrine. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("the *Chenery* doctrine []

6

forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced").

Second, the Government claims that the ALJ "thoroughly discussed" the evidence "pertaining to her edema." Dkt. #24 at 5. The Government, for example, points to a statement in the opinion suggesting that plaintiff's medical problems were resolved to some extent in December 2010 after she stopped taking certain medications. But as plaintiff argues, the ALJ only mentioned these facts in the narrative section and did not comment on them in the later analysis. *See Malinowski*, 2017 U.S. Dist. LEXIS 7160 at *3, n. 2. Therefore, it is not clear whether the ALJ endorsed this theory. Accordingly, this argument is foreclosed by *Chenery*.

Third, in tension with the first two arguments, the Government asserts that the ALJ included an RFC limitation to account for the edema-related problems. Specifically, the ALJ included the provision for one-to-two minute breaks every three hours. But this limitation appears out of the blue at the end of the opinion. The ALJ never explained the rationale for picking this particular amount of time (what evidence is there that such a short break would remediate swelling accrued from three hours of sitting?) nor does the ALJ cite to any medical testimony or opinion supporting this particular limitation. Consequently, the ALJ's was playing doctor in assuming that the limitation would address the underlying medical problem.[5]

**II.     Credibility Analysis.**

Given that the ALJ found that plaintiff had the severe impairments of fibromyalgia, lymphedema, and obesity and further found that these impairments could cause the pain and limitations plaintiff was alleging, a key issue was plaintiff's credibility. Plaintiff argues that the

---

[5] The ALJ referred at one point to plaintiff having "multiple tattoos" and suggested that they played a role in plaintiff's edema problems. R. 562. If the ALJ intends to rely on such a rationale on remand, the ALJ should ensure that it is first supported by a clear medical opinion or testimony.

7

ALJ's credibility analysis was flawed in at least five specific ways. Although these arguments overlap in places, the Court finds that they collectively offer a separate basis for remand.[6]

**Conservative Treatment.** The ALJ concluded that plaintiff was not credible because (among other things) her treatment was "essentially routine and/or conservative in nature." R. 562. The ALJ further stated that plaintiff's treatment was not what "one might expect to see" given her allegations. *Id.* This explanation is conclusory and constitutes improper doctor-playing.

Although the ALJ conclusorily asserted that plaintiff's treatment was conservative and routine, the ALJ did not discuss analyze the specific treatments and instead assumed that their conservative nature was obvious. This conclusion is not self-evident to this Court. Plaintiff asserts that her treatments were *not* conservative. *See* Dkt. #15 at 17 ("a look at Plaintiff's longitudinal record reveals that she had tried and failed multiple modalities of medication management"). The Government responds that plaintiff's use of morphine and other treatments were "noninvasive" and, therefore, conservative in nature. Dkt. #24 at 8. The Court need not determine which argument is right because it is sufficient to note that all these arguments consist of layperson speculations about what constitutes routine or conservative treatment for a person with fibromyalgia. On remand, the medical expert can provide context and background to allow for a more informed analysis on this question.

**Bad Days.** Plaintiff complains that the ALJ repeatedly overlooked (or disputed) plaintiff's assertion that she experienced "good days" and "bad days" with a large fluctuation in symptoms and daily activities. The ALJ stated that there was no "objective evidence" to substantiate the claim of "bad days." But this cursory explanation is insufficient. The ALJ failed

---

[6] An ALJ's credibility determination should be reversed only if it is patently wrong. *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015). However, an ALJ's decision may be reversed if the ALJ "fail[s] to adequately explain his or her credibility finding by discussing specific reasons supported by the record." *Id.*; *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (a credibility finding "must be specific enough to enable the claimant and a reviewing body to understand the reasoning").

8

to acknowledge that doctors often rely on a patient's subjective reports. *See Harbin v. Colvin*, 2014 WL 4976614, *5 (N.D. Ill. Oct. 6, 2014) ("Fibromyalgia is diagnosed primarily based on a patient's subjective complaints and the absence of other causes for the complaints."). The ALJ also failed to consider that plaintiff offered evidence other than her own testimony. Dr. Crowe and plaintiff's friend provided evidence supporting plaintiff's allegations.

**Lack of Objective Evidence.** This argument overlaps with the first two. Plaintiff argues that the ALJ improperly assumed that certain objective findings (such as no joint swelling or thickening) cast doubt upon plaintiff's credibility. This Court agrees. The ALJ provided no explanation as to what objective tests should have been performed. As plaintiff notes, there is no simple bright-line objective test to diagnose fibromyalgia. *See Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) ("[Fibromyalgia's] symptoms are entirely subjective. There are no laboratory tests for the presence or severity of [fibromyalgia]."). Therefore, the ALJ's assumptions—that certain findings such as joint swelling must be present—are based on layperson intuitions not supported by any medical opinion in the current record.

**Activities of Daily Living.** The ALJ found that plaintiff's daily activities were inconsistent with her allegations. Here again, this argument is intertwined with several others. The ALJ found it significant that there were statements indicating that plaintiff liked to fish and do other activities. But as plaintiff argues, these statements should be considered in light of plaintiff's claim that she had good and bad days. Moreover, the ALJ never made any finding about the frequency of these activities or even whether plaintiff was *currently* engaging in them. At the hearing, plaintiff stated that she had greatly curtailed these activities. *See* R. 583 ("I don't even really do my hobbies anymore.").[7] The ALJ did not acknowledge this testimony and

---

[7] *See also* R. 587 ("I can't do my hobbies anymore because it's just too much. Whether it be trying to sit on a bank and go fishing, I can't hike to that fishing spot. And even then when I sit there, even with my feet propped up, the

assumed that she was continuing to do these hobbies based on a few ambiguous doctor statements that plaintiff "enjoys fishing." The evidentiary weakness of the ALJ's argument is illustrated by the Government's arguments in defense of it. The Government undertakes a grammatical forensic analysis, arguing that a doctor's use of the present tense (referred to as "present-tense information") demonstrates that plaintiff was still regularly engaging in these hobbies. Dkt. # 24 at 7. This argument is a tenuous basis for finding that plaintiff was lying about her daily activities.

**Hair.** Another reason the ALJ provided for doubting plaintiff was the following argument: "At one point the claimant stated that she needed help washing her hair but at the initial hearing, I observed that her hair is very long. It is reasonable to assume that if this were a significant problem she would cut her hair in order to relieve herself of this burden." R. 562. In her opening brief, plaintiff simply declared this argument to be "nonsensical." Apparently, the Government agrees because it offered no counter-argument in its response brief. The Court likewise does not find this argument persuasive. Not only is it a draconian solution, one that if pursued to its logical conclusion would mean that plaintiff should shave her head bald, but it also would not necessarily eliminate the problem because plaintiff presumably would still have to reach up to some degree to wash short hair. Moreover, plaintiff testified that her husband not only helped wash her hair on bad days, but also washed her legs and feet. R. 51, 59. In sum, the ALJ's choice to highlight this questionable rationale raises doubts about the credibility analysis.

### III. Friend's Testimony.

Plaintiff complains that the ALJ improperly gave "no weight" to the testimony of her friend, Renee Palmer. The ALJ's explanation is set forth below:

---

swelling gets worse to the point that the pain is just ridiculous and I don't want to be out in public where people can see me. I can't go and do the camping anymore because I can't get up and down.").

> She is not an acceptable medical source and is naturally sympathetic to the claimant. Furthermore, she did not refer to the medical record.

R. 563. These three arguments are insufficient. As for the claim that Ms. Palmer was not an acceptable medical source, this is true but not a reason to disregard her testimony. SSR 12-2p states explicitly that "information from nonmedical sources," such as "[n]eighbors, friends, relatives, and clergy," are helpful in evaluating "the severity and functional effects of a person's [fibromyalgia]." As for the argument that Ms. Palmer as a friend was "naturally sympathetic," this is also true to some extent, but is still not a reason by itself for completely rejecting her testimony. Finally, as for Ms. Palmer's failure to refer the medical record, this is both unfair and unrealistic. She was testifying about things she personally observed, not offering a layperson analysis of medical records that she likely never even saw. In short, the ALJ's three reasons could be rotely cut and pasted into any opinion involving a friend's testimony. This is not what the SSR regulations contemplate. On remand, the ALJ must give more consideration to this testimony. Ms. Palmer testified about a number of different issues, including the frequency of good and bad days, and provided specific details about plaintiff's daily routines. *See* R. 588-592.

### IV.   Medical Opinions.

Plaintiff's final argument is that the ALJ misapplied the treating physician rule in considering the opinion of Dr. Crowe, a treating physician. *See* 20 C.F.R. §404.1527(c)(2). This opinion is a four-page Physical Residual Functional Capacity Questionnaire, dated July 2, 2010. Ex. 8F. Dr. Crowe gave several opinions, including that plaintiff could sit no more than two hours, that she would be absent more than four days a month, and that she would need to elevate her feet to 90 degrees for 40% of the workday. R. 490-91. The ALJ found that her opinion deserved "no weight" because she "fail[ed] to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled" and because her

11

conclusions were not supported by other evidence in the record. R. 563. Plaintiff complains, however, that the ALJ failed to follow the two-step procedure under the treating physician rule and specifically failed to explicitly apply the required six factors under the checklist.

The Government wisely concedes that the ALJ failed to follow this rule.[8] The Government instead argues that any such failure was harmless error. This Court is not inclined to engage in a time-consuming and difficult harmless error analysis here. First, the Court has found that a remand is required under other arguments. Therefore, even if the Government's argument were successful, it would not avoid a remand. Second, the Court finds that the ALJ's analysis of the medical opinions is conclusory and relies heavily on the ALJ's layperson intuitions about fibromyalgia. These points have been covered above.

Here, the Court emphasizes one particular concern not heretofore addressed. As the Government argues in its brief, the ALJ believed that "Dr. O'Laughlin's contrary opinion was better supported by the evidence compared to Dr. Crowe's." Dkt. #24 at 15. This conclusion is questionable and, at a minimum, needs more analysis to be accepted. A summary of the key points from the report explains why. Although his report is vague in places, Dr. O'Laughlin apparently concluded that plaintiff was suffering from *no* disease or significant problem. *See* R. 827 ("We see nothing to treat at this time based on physical examination and reviewing the history.")' R. 561. As for fibromyalgia, Dr. O'Laughlin stated as follows:

> [P]atient may or may not have fibromyalgia which of course is [] difficult to diagnose in terms of proving it or disproving it. In short, patient has little, in fact, no objective findings of any disability and appears to have no evidence of any disease process.

R. 827. In other words, on this central issue in the case, Dr. O'Laughlin essentially threw his hands up in the air, offering an ambiguous and uninformative explanation. Moreover, Dr.

---

[8] The Court appreciates the Government's acknowledgment of this Court's numerous recent rulings holding that ALJs must *explicitly* apply the checklist.

12

O'Laughlin found that plaintiff could do a vigorous array of work activities. Specifically, he opined that plaintiff could lift and carry up to 100 pounds one-third of the workday; that she could sit, stand, and walk three hours without interruption; that she could sit, stand, and walk each for a full eight hours in a workday; that she could climb ladders or scaffolds up to two-thirds of the workday; that she could also balance, stoop, crouch, kneel, and crawl for two-thirds of the day; and that she could work continuously throughout the entire workday at unprotected heights. R. 832-35. These findings strain credibility, particularly in light of the fact that plaintiff was obese (220 pounds and 5'6" at the time of this examination). R. 827. Dr. O'Laughlin's findings are also arguably inconsistent with the findings and diagnoses not only from Dr. Crowe, but from many other doctors, including Dr. Hovis, Dr. Habib, and others who prescribed pain medications and recommended other procedures such as compression boots. Finally, Dr. O'Laughlin's opinions, which the ALJ gave "some weight", are inconsistent with the ALJ's finding that plaintiff's fibromyalgia was a severe impairment. At a minimum, on remand, the ALJ should analyze Dr. O'Laughlin's opinion more carefully rather than conclusorily finding it to be consistent with the "objective medical record as a whole." R. 564.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: February 27, 2017          By: _____
                                      Iain D. Johnston
                                      United States Magistrate Judge